Donald, will the judges adopt this Court of Appeals for the 4th Circuit? All right, good morning. We're prepared to hear argument in our third case. Young v. Equinor USA Onshore Properties, Inc. Mr. Lin, whenever you are ready. Thank you, Your Honor. Good morning, and may it please the Court. My name is Albert Lin, and I'm here on behalf of the defendants. This case raises several questions of first impression about a decision of the West Virginia Supreme Court of Appeals, the estate of Taney. We think there are three ways, respectfully, to decide this case. First, because the parties waived the implied duty to market for the life of the lease, Taney simply has no application here. Second, even if Taney applies, its requirements were satisfied. And third, this Court could instead certify to the West Virginia Supreme Court of Appeals because this case raises several questions of first impression and the West Virginia Supreme Court of Appeals has expressly called Taney into question. Yes, Your Honor. Of those three avenues, which is your preference? We think the easiest is the waiver of the implied duty to market, although we do think all three of them are acceptable to us, whatever the Court prefers. So if I may, Your Honor, I will turn first to the waiver of the implied duty to market. We think because of that waiver, Taney has no application here, and I would start, Your Honors, with I think two critical concessions by the plaintiffs that narrow the issues. The first is they concede that Taney is premised on the implied duty to bring gas to market. And then secondly, they concede that the implied duty was in fact waived for at least part of the life of the lease. So the question on this for the Court is whether that waiver extends into the current period that we're in. And we think the answer to that is clear for at least three reasons from the lease language. The first is, if Your Honors look at the lease development provision, it says that there is no implied covenant to market within the primary term or, and here's the operative language, any extension of term of this lease. And so the three reasons are, one, I think any extension of term of this lease on its face refers to the lease term, which is defined as the life of the lease, and I'll come back to that. The other two reasons very quickly are the district court and the plaintiffs contend that that extension provision only refers to extensions of the primary term. But in the lease, there is a struck-through provision that uses specifically that phrase, extension of primary term. So I think when the drafters wanted to say that, they knew how to say it. And then third, I think the consequences of the district court's reading and the plaintiff's logic don't make a lot of sense. Their view is that the implied duty was waived only during the primary term at any extension of that primary term, but it springs back to life in the current period or the secondary continuing term, and there's really no logical reason why an operator would agree to something like that. But I do think this, yes, Your Honor. Can I just ask you a quick question about the language that you were just quoting, within the primary term or any extension of term of this lease? It looked to me like there was a word missing between of and term. Shouldn't it be something like any extension of the term or any extension of this term or any? Is there a word missing? I don't think so, Your Honor. I think you've put your finger on an important point. I think the fact that it doesn't say any extension of a term or that term, I think what it's trying to say is term of this lease. And I think term of this lease is admittedly a somewhat awkward and more wordy way of saying the lease's term. So like a child of this father, the father's child. I think that's why there is no article there, whether it's a or the. It's referring to the lease's term. And lease term, Your Honor, is a defined term under the lease. On the very first page of the lease, it actually says lease term in about halfway down that page. And it defines that lease term as basically the life of the lease. This lease shall remain in force for a primary term and shall continue beyond the primary term if any of these various conditions come to pass. And it actually goes on to say that one of the conditions is true. It sort of subsumes within the concept of the generic lease term these more specific ideas of primary and secondary terms. So I think, Your Honor, to answer your question, I think that actually was intentional. And I think what it's doing is it is, and I will admit freely, that it is a somewhat awkward way of saying the lease's term. But it is, grammatically, that's what it says. It's a possessive. It's saying the possessive of lease. So it's referring to that term. And so I think, Your Honor, when you look at just that plain language in that clause, it's very clear that the implied covenant has been waived not just for the primary term, as the plaintiffs concede, but for the full life of the lease. And if that's true, because Taney is premised on the implied duty, and if you look at Taney, I think that's clear. And I don't think plaintiffs contest that. They say at page 8 of their opposition that the reason for these requirements is because of the implied duty. And Taney actually, when it was answering the certified question, it actually reframed the question to incorporate the implied duty as a premise to the question it was answering. It says, in light of this implied duty, is this language that's at issue here ambiguous? And so, yes, Your Honor. Well, I mean, it seems to me that implied duty or not, that once the lessee does begin to market the lease, market the oil and gas, there has to be some method by which to calculate the cost, whether pre-production or post-production. So I'm not sure that that's helpful if, in fact, your client has begun to, you know, begin activity on the lease. At that point, if there's going to be a dispute about who bears what cost, don't you think it is important to at least have some basis for assessing that? Absolutely, Your Honor. I do think the sort of, obviously, concepts of notice are important here, and it's important that it's clear from the lease that the parties agreed to share the costs, what those costs would be, and how you would calculate those costs, as you point out, Your Honor. Our point on the implied duty is, I think, because ultimately the question that's raised by the district court's opinion here and by the plaintiff's is that this lease fails the requirements of Taney. I don't think the requirements of Taney, which put a thumb on the scale in favor of requiring extra clarity, I don't think those requirements apply. But we can, Your Honor, yes, Your Honor. I just, I think I'm asking the same question, but I had the same question. I want to make sure I understand the answer. So even assuming that the implied covenant has been waived, right, it's not your position that that automatically shifts post-production costs over to the landowner. It just gets you out of sort of a clear statement rule, and now you just look at the contract to see if the intent is clear that the landowner is going to bear these costs. Is that right? Yes, Your Honor, that's right. That's right. I think it takes that clear statement rule away, and so to the extent that the district court relied on that clear statement rule, which I think it did, to impose this very, very specific and onerous requirement of articulating a mathematical formula, I think that goes away. And I think when you look at the terms of the contract, which I agree, Judge Diaz, you do have to obviously look at those terms, I think it is clear that the parties agreed. There's no dispute here. If we just want to talk about it, since I think it makes sense just to move into the framework of Taney, I think there's no dispute here as to prong one that the parties agreed and that there's sufficient notice in the contract that they would share post-production costs. The real action here is on prong three, Judge Diaz, as you referred to this question of the method. Is there enough here that indicates the method? And I think it's important just to take a pause here and point out that I think the district court and the plaintiffs are, at this point, complaining about two different things. The district court's issue seemed to be with whether there was enough in the contract to indicate the method of calculating the bucket that constitutes post-production costs. So what is that? The plaintiff's brief seems to have abandoned that. And instead, their complaint is about whether the lease has enough to give notice of the fractional share of that bucket that will be borne by the plaintiffs or the landowner. And I think we can turn to that first, the plaintiff's complaint. And I think that's all this court needs to reach, given the way that they've decided to plead the issue here. And they concede that this formula that we articulate at page 10 of our brief that sets forth how you get to the fractional share of the post-production costs would be enough. And they say that at a couple places in their brief that that would be enough, but they say it can't be found in the leases' terms. But I think, Your Honor, as we point out in our reply brief, I think it can be very easily from three provisions of the contract. The first is the provision that discusses the royalty. And that says that the royalty is going to be 14% of the gross minus the post-production costs. So if you do the basic arithmetic here, that means 14% of the post-production costs. Then you look at the provision that's entitled payment reductions. And that is the provision to account for the possibility that a plaintiff may not own the entirety of a piece of land. And all it says is, in that case, you get whatever proportional share of the royalty that is equal to the proportional share of your ownership of the land. And so that's X percentage times Y percentage. And then the third fraction comes from the utilization and pooling provision, which is similar to the payment reduction provision. That's the one that says that if you've pooled the various pieces of land together, of course you're only going to get the royalty that reflect the proportional share of your section of the pool. So that's another fraction. Call it Z percentage. And that's it. And the lease, I think, clearly articulates those three fractions. And you multiply them together. And that gives you the ultimate fractional share. And I think to answer your question, Judge Diaz, I think that with or without Taney, give sufficient notice of how, the method, how are you going to get to the fractional share of the post-production costs that are going to be shared, that are going to be borne by the landowner here. Yes, Your Honor. Of course. So if this is all so clear as to how it should be determined, why is it that in your brief you argue that Taney establishes a standard that no lease could satisfy? I thought you just found a way that this lease could satisfy the Taney standard. Your Honor, let me see if I can clear that up. I think what we were arguing. Go ahead. Your Honor, I think what we were arguing is that the district court's view of the sort of mathematical precision that is required, that reading of Taney could not be satisfied because you cannot calculate at the outset specifically what they're going to be required to pay in terms of post-production costs. I think what a method is referring to is something at a little bit of a higher level. I think things that are methods are a proportion or an apportionment or all, for example, would be another method. And I think this, just to be totally clear, is not the argument that the plaintiffs are making now. I think, again, the plaintiff's complaint is about whether the fractional share is clear. But in terms of the district court's complaint, is there enough here to demonstrate how you're going to calculate that bucket that constitutes post-production costs? I think it's there, and I think there's two ways that are articulated in the lease. One is for post-production costs that are contracted out to a third party, and the other method is for post-production costs where the operator uses its own infrastructure. As to the first part, post-production costs done by a third party, what it says is all costs and expenses relating to these various things, separation, transporting, treating, process. But the method is all. And as I said, I think that's a legitimate method. Another method could be half. Another method could be proportional to the distance of the pipes. But this method is all. So for third party post-production costs, it's all. And then that same paragraph goes on to say, of course, an operator can use its own infrastructure to do these various things. And if it uses its own infrastructure, then the method is reasonable amortization, reasonable depreciation, a reasonable rate of return. And again, those are methods. I think if you were to talk to any accountant, they would say those are methods of calculating. I don't think, again, what the normal contracting principles or even TANI would require something very precise to tell the landowner exactly what the costs are going to be. These are methods. These are mathematical methods. All sum, proportional, reasonable amortization, reasonable depreciation. So I think as to both pieces of this, whether it's the district court's concern about whether the lease has enough to indicate the method to calculate the bucket of post-production costs, or plaintiff's new concern about whether the lease has enough to indicate the method of calculating the fractional share that is borne by the landowners, I think both of those are clear from the lease. And I see my time. Yes, Your Honor. I think you hit on this at the very end. But overlaying all of this is obviously the landowners aren't left without a remedy with respect to these costs if they feel that they are excessive, because there's an element of reasonableness to all of this, right, that you would have to satisfy. And we could litigate that. But the math is there. It's just a question of whether or not the lessee is acting reasonably in expending those costs. Is that right? That's right, Your Honor. If I may answer. Go ahead. Go ahead. Yes, Your Honor. And I think both sides actually agree on that, and the district court recognizes it, too. The Wellman case, which is the predecessor case to Tawny, says that on top of all of this is, Your Honor, this back-end check of, one, reasonableness, and, two, actually incurred. You can't simply charge them for something that you did not actually incur. And that's a remedy that the plaintiffs could seek once the post-production costs were deducted. All right. Thank you. Yes, Your Honor. We've got some time left for rebuttal. Mr. McGraw, whenever you're ready, go ahead. Thank you, Your Honors. May it please the Court. Jeremy McGraw on behalf of the appellees, the Youngs. Despite some of the ways that the appellants try to characterize the district court's rulings, I don't think that there was anything. Mr. McGraw, we can hear you fine. The video, at least on mine, is not coming across all that clear. But we can hear you, so I just wanted to let you know that. Go ahead. Thank you, Your Honor. I just want to say I don't believe that there's anything controversial or confusing about what the district court did. I don't think there's really any conflict between what we're arguing in our briefs and what the district court did below. The district court did exactly what it was supposed to do under West Virginia law, sitting in diversity. It was required to take the clear controlling authority and apply it. I don't think they did that in this case. Now, there was a question about that lease development clause and whether there's some wording missing there in that extension of term. There's a couple reasons why I think that, at best, that lease development clause language is ambiguous. The first being you've got this statement that there's going to be no implied covenants, quickly followed by a second statement that says there will be no forfeiture, termination, or expiration. Obviously, if there's no implied covenants, you're not going to have those other things. So what is the purpose of that second sentence? The reasonable reading of that second sentence is that those things do apply at some point. And I think this gets into that confusion there about whether there's any word missing in that extension of term. The primary term of this lease and the primary term under all leases is a situation where this oil and gas company has paid for a right to delay its decisions as to whether it's going to make operations. So it certainly makes sense and it's reasonable that they would not want to have any of these implied duties or other obligations during that time. But once they decide to take those operations and move forward and this lease moves into what's called the secondary term, those obligations would jump back in. There's nothing confusing about that. It certainly makes sense that when this lease goes into the secondary term, they've got a different set of obligations because at that point, they are required to act. They are required to do things. They're not required to do anything during that primary term. During that primary term, the lease will either expire at the end of the date or it will switch over to the secondary term when certain operations have taken place. The counsel talked about this extension of primary term and the lease term language talking about going beyond the primary term. Mr. McGraw. Yes, Judge.  So you and perhaps Mr. Lynn as well think that TANI is clear and controlling authority. But what about the fact that TANI has been criticized by the West Virginia Supreme Court itself? Isn't that a reason to certify all of this or at least the question of TANI's import and meaning to the West Virginia Supreme Court rather than have us muck around in what is a uniquely West Virginia issue? I don't think that it does because the West Virginia Supreme Court in the Legate Decision specifically said Wellman and TANI are unaffected. There's still valid law on those points as it stands in West Virginia at this point. The issue of certifying questions is whether or not there's no controlling authority or confusing control authority. There is no – I don't think there should be any dispute that TANI is still the controlling law on this issue in West Virginia. Whether or not the West Virginia Supreme Court might do something else in the future is a different question. And there was certainly a whole lot of history into how the Legate Decision came about based on re-hearings and elections and a lot of things going on politically here. But the case law in West Virginia – Well, we do have – that's the nature of our Supreme Court in West Virginia. The Supreme Court, I guess, in West Virginia. And you are correct, Your Honor. And actually after that time, there's been some steps to try and make it a little less political including non-partisan elections. But the district court took the law from TANI, took the law in Legate that said Wellman and TANI are unaffected and applied it. There's no reason that this court can't do the exact same thing. And I would remind the court that we filed this case in state court. We were in the West Virginia state court system. The defendants removed this case to the federal court system. They asked for the federal court jurisdiction. They asked – As we're entitled to do. And they never asked Judge Bailey to attempt to certify this question. It was only after they got the ruling that they didn't like that they asked for certification. Are they – does the fact that they didn't ask the district court to do that, does that mean that we can't certify the question? No, it certainly does not. If we wanted to? No, it certainly does not. You have the discretion to do that as well. But I think if you look at the Certification Act and the reason for those rulings, it's when you have this issue and there's no controlling authority that applies. Here you have very specific, not very complicated controlling authority that tells you exactly what you've got to do and what you've got to include in these leases. Yes, Judge. So going to that point, like your colleague, I read your brief to be saying that it would be enough under the third prong of TANI if a lease made clear how it was going to determine – how it was going to apportion costs among various – I get lessors and lessees mixed up – landowners, among various landowners. And that the problem here is that the lease didn't make that clear. Is that your position? That is correct. It is our position that under TANI, that third method – the third step is to indicate the method of calculating the amount to be deducted. So they want to point at this language and say all costs and this list of costs. The question is not that they're going to take out costs. The question under TANI was how are you actually going to allocate and apportion that cost to this individual landowner? And that is what is missing from this lease agreement. They want to point to this paragraph 12 – I'm sorry, paragraph K, the payment reduction clause, which absolutely never mentions costs at all. It really only applies for situations where an owner may or may not actually own the full mineral interest. Say a later title search shows that they only own 50%. Even though you signed the lease for 100%, they're not going to pay you the 100%. They're only going to pay you on your 50%. They look at the pooling and unitization clause. Again, the pooling and unitization clause never mentions costs or deductions. What the pooling and unitization clause does is it allows the operator to combine this property with other properties and then specifically states that the lessors, the royalty owners, are going to share the revenue from these wells based on that proportion. The dictionary definition of revenue is even a total amount. So I don't think that there's anything in those two clauses that get them to this idea that this lease clearly says that they're going to proportionately share costs. Had they just put it in there, that would have been enough. Had they put in the lease the language that Mr. Rickman put in his email to my client when my client questioned this, that would have been enough. I mean, that specifically said, yes, Your Honor. I'm sorry, just so I understand the position. So if we were in a case where there's only one landowner and there's no pooling, so it's just one landowner and no pooling of costs or anything, then why wouldn't it be enough if you just said all costs? Like the way I'm distributing the costs is the gas company pays none and you, landowner, pay 100 percent. That seems like it would be enough. I don't think that it would because I think all is still the descriptor of the types of costs. It doesn't get you to the method of how they're going to be distributed. If it's at 100 percent, the distribution will be as follows. The gas company pays 0 percent of the post-production costs and you, landowner, pay 100 percent. That would be fine, right? I would think under Taney that might actually apply. That might be good enough. But that's not the situation that we have here. I understand. So the only problem you see here under Taney is that you don't think it's clear enough how the costs will be apportioned among various landowners. Well, and how it's specifically going to be apportioned to this landowner, too, because it never actually says we're going to charge you 14 percent of the cost. That's more language that they're trying to draw and pursue from other parts of the lease. So they're not saying we're going to pull all costs. What he said today was we're going to pull 14 percent of all costs. It never really even says that in the lease agreement. I don't mean to belabor a lot of the issues. Yes, Judge? Is there a case that you consider controlling on how the third prong of Taney is to be applied? I do not believe that there is a specific case that has interpreted that, but I don't think that means it needs interpretation. It's a pretty clear statement from the Western Virginia Supreme Court. It really didn't use complicated language to describe what was required. I think you all have spent a lot of time and litigation on what you say is a pretty clear statement. It's not that clear to me still. Wait. Yes, Judge Harris? I mean, the district court, right, it seems like the district court had something very different in mind. As I read the district court opinion, it did seem to be saying, like, it's not enough to say how you're going to apportion costs. Like, I don't know what exactly the district court had in mind, but I think it was more like, tell us how you're going to figure out how much it will cost to do these things that you've listed in two. I thought the district court was reading it differently than both of you are reading it today. But you think the district court was reading it the same way you're reading it today? I do. I don't see the discrepancy. I do believe that the district court was mainly concerned with determining how you're going to come up with this amount that's ultimately going to be deducted from the royalty share. And I don't think our statement of how that is done in the brief is really inconsistent with what the district court said. What about all that business about uniforms and employee meals and stuff like that? You think all of that went to how are we going to know in a pooling arrangement how much each landowner pays? I think that was just more of a general statement of the uncertainty that lies in these issues with post-production costs. You've got an asset that this royalty owner owns. They enter into what is essentially a business agreement to allow someone else to produce that. And now this third party is going to take all these deductions out and not really give you any accounting as to what those things actually are or an explanation in advance as to how they're going to do that. So I don't think that that was a specific statement that in this case I'm worried that they're going to take out uniform costs and we don't know how they're going to do that. I think it was just more of a general statement of that's the type of problems you get into in these cases when you have the gas companies guarding the hen house on these costs and expenses. And in actual practice, you see landowners losing 50%, 60%, 70% of their royalties to these post-production costs. Getting back to that third point of Tawny, the language there was just to indicate the method of calculating the amount to be deducted. I don't believe that that's very confusing language. The district court looked at the dictionary definitions of method and calculating. The appellants want to ignore those dictionary definitions while looking just at the dictionary definition of indicate. I think when you combine those three dictionary definitions together, you get even more of a clearer statement that what we're all looking for here is a process, a procedure, a technique for how you're going to mathematically perform this. I would agree that at the time you enter this lease, you're not going to know what exactly that decimal number is to be able to make that final calculation. But you at least should state in the lease that that's how we're going to do it. We're going to take your decimal interest of ownership, multiply it by the costs, and that's going to be your share of what you actually pay in this case. That is not an onerous statement. That's something that's easy to me, and they took steps to do so in an email to my client and in their brief. All they had to do was actually state that in the lease agreement, and they would have been fine. But they did not do that, and it's a failure of drafting on their part. And to the extent there's any ambiguities, it goes against them. Mr. McGraw, just so I'm clear about what your position is here. Your view is that your client could reasonably or doesn't really know whether or not the lessee in this case intended to deduct all, some, or part of the costs? Is that the argument? That is part of the argument, yes, Your Honor. So when they see this agreement, there's something that says they're going to take out all these costs. There's no explanation as to how that's actually going to be apportioned or attributed to you and your royalty share, which is what that third element of Tawny was looking at. But the lease itself, it talks about the net amount realized by the lessee, and then it talks about how to get to that amount. And it says the gross proceeds received by the lessee from the sale minus post-production costs incurred by lessee. That would suggest that there is no fractional allocation of costs. It's the entire amount of the costs. And then so you deduct those two amounts, and then you calculate the royalty by multiplying times 14% and making the divisions among the various landowners. That doesn't seem all that difficult. Well, I don't even think that that's the positions they've taken today. Their position is that they're not taking out all the costs. They're only going to take out 14% of the costs. I just don't see how stating we're going to take all of these costs is a method of calculating. Right, I mean, they're allocating 14% of the cost to your client ultimately because that's the amount of the royalty. But they begin with a deduction of all of the costs, I think. That's certainly part of the position they've taken today, that they can take out all of these costs. But as I said before, I don't think this lease ever goes on to fully explain that they're only going to take out – they're going to apportion those costs to the landowner in proportion to what their ownership interest is in this unit. Because you're not talking about one well on one piece of property. You're talking about a couple wells covering 600 acres of property. They don't keep expenses as it relates to each individual property. They keep expenses as a gross, as a whole unit, and then they're creating this way to try and allocate that back to the landowners. But they never explain to the landowner in the lease agreement that that's what they're doing. And I think that's where they fall flat under the third element of TANI, which I don't think is very confusing and complicated. It's just indicate the method of calculating the amount to be deducted. So it's not a calculation of how you get to your royalty payment. It's a calculation of how you're going to get to that amount that is deducted to finally get you to your royalty payment. Which, again, I believe had they included that explanation that they did in the email to my client when he asked about that, had that been in the lease agreement, that would have been good enough. But it's not in the lease agreement. And as try as they might to reach out to these other provisions of the lease, those other provisions of the lease never mention costs. They never make this assertion that they're going to split this up proportionally. Those other provisions are all talking about how the owner is going to get paid, whether or not they own the full interest, or how that owner is going to share the revenue from the wells with all the other owners, whether or not the well is actually located on their property or not. All right. Do either of my colleagues have any additional questions? Doesn't look like it. Okay. Thank you, Mr. McGraw. Thank you. Mr. Lynn, you have some time for rebuttal. We can't hear you, Mr. Lynn. Sorry. I was on mute. I need to learn from my own children. You can get that right. If I could just cover two things. I'll start on the certification question, Judge Thacker, and your question about whether there's controlling authority here. I think I heard my friend say there is no controlling authority on the meaning of indicate the method. I think the important way to think about this is Taney, in this case, is like a West Virginia statute that's being applied. Taney is the original thing that's being applied. There is no case that interprets that statute, in this case, that rule in the case. The only thing we know from the West Virginia Supreme Court about Taney is that they think a majority of that court thinks that it's faulty and suggests that they may even want an opportunity to overrule it. I will also note, we do think that wherever the line is for indicate the method, that we are well past that, which is why we think it's clear, Judge Thacker. To Mr. McGraw's point, I don't think it's really that obvious where that line is. There are two district courts in West Virginia that have disagreed about the meaning of indicate the method. Judge Bailey, in the decision below, specifically disagreed with Judge Goodwin in the W.W. McDonald case out of the Southern District. As to the method, Judge Diaz, I wish I had said it as clearly as you had. That's exactly what we think the lease makes clear. I think about things in a mathematical way, but I think really it's a formula where you get the pieces from the lease. What the lease says is that the royalty is the gross proceeds minus the post-production costs. How do we get the post-production costs as part of that formula? It's all of the third party post-production costs and expenses for the various things that are listed, treating, separating, transportation. Then it's if the operator uses its own infrastructure, it's reasonable amortization depreciation. That's how you get to that number, the post-production costs that you subtract from the gross proceeds. Then some portion of that is the royalty. How do you figure out that portion? 14% times if there's some fractional share of the property, and then times if there's some proportionate share because of pooling. Mr. McGraw, my friend, says that neither the payment reduction provision or the utilization and pooling provisions refer to costs. That's true. They don't say costs, but what they refer to is royalty. They say in both places, royalties, this is the payment reduction provision, paragraph K, royalties here under shall be paid to lessor. Judge Harris, the landowner, I get those things confused myself. Royalties here under shall be paid to lessor only in the proportion which lessor's interest bears to the whole and undivided fee. That's the percentage of the royalty if there's some ownership that's less than the whole. Utilization and pooling, same thing. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit such, quote, proportional share of the royalty. It goes on to say, as the number of leasehold acres included in the unit bears to the total number of acres in the pool. What we're talking about is, again, if you're part of a bigger pool, you have to do that percentage as well. So it's 14% of the whole thing gives you the royalties, and then if there's some reduction for property, some reduction for pooling. So I think all of these pieces are in the lease, but Judge Thacker, if there's any question at all about what indicate the method thinks means, I think the West Virginia Supreme Court of Appeals should be the one to weigh in. Thank you. Thank you both for your excellent arguments here today. The case has been submitted. We would typically come down from the bench and greet you personally. Obviously, we cannot do that here today. But we very much appreciate your being here and helping us to do this work that we're trying to do in very challenging circumstances. So thank you for bearing with us. The court will stand in recess, and we'll call our final case here after we get everybody on board. Court stands in recess. This is how the court takes a brief recess.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris